R. A. RIDDELL, District Director of Internal Revenue, Los Angeles District, Appellant,

v.

CALIFORNIA PORTLAND CEMENT COMPANY, Appellee.

CALIFORNIA PORTLAND CEMENT COMPANY, Appellant,

v.

R. A. RIDDELL, District Director of Internal Revenue, Los Angeles District, Appellee.

No. 16438.

United States Court of Appeals Ninth Circuit.

Jan. 2, 1962.

Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, and James P. Turner, Attorneys, Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Edward R. Mc-Hale, and Eugene N. Sherman, Asst. U. S. Attys., Los Angeles, Cal., for Riddell.

Musick, Peeler & Garrett, by Joseph D. Peeler and Stuart T. Peeler, Los Angeles, Cal., for Cal. Portland Cement Co.

Joseph T. Enright, Norman Elliott and Bill B. Betz, Los Angeles, Cal., for Monolith Portland Cement, amici curiae.

Before STEPHENS, BARNES and KOELSCH, Circuit Judges.

BARNES, Circuit Judge.

The District Director of Internal Revenue appeals from a judgment of the district court awarding taxpayer $1,073,-612.46 in refund of income taxes previously paid for the taxable years 1951 and 1952. The taxpayer also appeals, as protective procedure, from the court's refusal to classify its product as chemical grade limestone, entitled to a fifteen per cent rate as a depletion allowance. We shall for convenience refer to the District Director of Internal Revenue as "appellant" or "government" and to California Portland Cement Company as "appellee" or "Company."

This is one of several "statutory percentage [mining] depletion allowance" appeals involving federal income tax payments, heard by this court within the past several years.[1] All of them have involved to a greater or lesser degree, the issue finally passed upon by the Supreme Court in the Cannelton Sewer Pipe Company case (United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, 80 S. Ct. 1581, 1582, 4 L.Ed.2d 1581), plus others peculiarly their own.

Jurisdiction was conferred below by 28 U.S.C. §§ 1331(a), 1340 and 1346.

1. Riddell v. Victorville Lime Rock Co., 9 Cir., 1961, 292 F.2d 427 (decided June 23, 1961); United States v. Pacific Clay Products, 9 Cir., 1960, 285 F.2d 215; Monolith Portland Cement Co. v. United States, 9 Cir., 1959, 269 F.2d 629; C. I. R. v. Belridge Oil Co., 9 Cir., 1959, 267 F.2d 291; N. L. R. B. v. Texas Independent Oil Co., 9 Cir., 1956, 232 F.2d 447; Usibelli v. C. I. R., 9 Cir., 1955, 229 F. 2d 539.

This court's jurisdiction on appeal rests upon § 1291 of Title 28 U.S.Code, as amended.

Appellee is a California corporation maintaining its principal place of business in Los Angeles, California. During the years in question it was engaged in mining rock from its Colton Quarry and Slover Mountain deposit at Colton, California. It processed such raw material to obtain finished cement, which it sold. There were also marketed small quantities of by-products.

The findings state that the appellee produced during the two years in question: (a) as its principal business, calcium carbonate rock for cement (Finding No. 4); (b) approximately 111,000 tons of crushed and screened calcium carbonate rock, sold for use as fluxstone for the production of steel (Finding No. 5); (c) approximately 119,000 tons of calcium carbonate rock, sold for use as glass sand, poultry grits, roofing grits, and clay pigeon filler (Finding No. 6); (d) approximately 20,600 tons of calcium carbonate rock which it used in its own plant to produce finished lime products (lump lime, ground quicklime, and hydrated lime; Finding No. 7); (e) approximately 1,240 tons of paving dust (Finding No. 8); (f) approximately 523,000 barrels of 376 pounds each of cement clinker, sold to Blue Diamond Corporation (Finding No. 9).

Items (b) to (f) above were found to be by-products, incident to the cement producing operation listed under (a) above. The aforesaid by-products supplied all the commercial market available to appellee, and each was found to be "the first commercially marketable mineral product derived by plaintiff from such portion of its calcium carbonate rock so used."

The trial court found that "mineral materials of shale, iron ore, quartzite, gypsum, Phillip's shale and various purchased nonmineral materials were added by plaintiff" to its calcium carbonate rock in the production of cement clinker and finished cement, and that this "was part of the application of the ordinary treatment processes normally applied by mine owners and operators in the cement industry." In so finding, and in making its conclusion of law based thereon, the trial court, of course, did not have the benefit of the later decision of the Supreme Court in Cannelton, supra.

After the Cannelton decision came down, we asked for additional briefs from each side, and permitted the filing of an amicus curiae brief on behalf of Monolith Portland Cement Company. We have had the benefit of copies of the government's opening and reply briefs (and the five hundred page Appendix) in Cannelton. We have also had the benefit of the following decisions rendered since Cannelton: Bookwalter v. Centropolis Crusher Co., 8 Cir., 1960, 281 F.2d 798, withdrawing its decision at 272 F.2d 391; Great Bend Brick & Tile Co. v. United States, D.C.Kan.1961, 194 F.Supp. 309; Standard Realization Co. v. United States, 7 Cir., 1961, 289 F.2d 247; Commissioner v. Halquist, 7 Cir., 1961, 291 F.2d 49; United States v. Portland Cement Co. of Utah, 10 Cir., 1961, 293 F.2d 826.

The general issue presented by the appeals herein is the determination of a proper basis for computing mineral depletion allowances to be deducted from taxpayer's income because of the alleged exhaustion of capital assets arising from appellee's business. It becomes necessary to determine: (1) What is the product appellee is mining? (2) What percentage of depletion is applicable to that which is mined? (3) What is the proper "cut-off point" at which the percentage of depletion applies? (4) Whether either the cost of minerals added to any product during production, or the cost of sacking any product, can be added to the production costs incurred in producing the taxable product.

The first question as to what is being mined was answered by the court below as "calcium carbonate," (depleted at ten per cent) rather than "marble," (depletable at five per cent) within the meaning of § 114(b) (4) (A) of the

1939 Internal Revenue Code, 26 U.S.C. § 114(b) (4) (A). The taxpayer urges that it is "chemical grade limestone" (with a fifteen per cent depletion rate).

The Internal Revenue Code of 1939 provides in § 23 that certain deductions may be made from gross income. One of them is depletion. Subsection (m) of § 23 reads, in pertinent part:

"(m) *Depletion.* In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * *"
(26 U.S.C. § 23, 1952 ed.)

The same Code, § 114, "Basis for depreciation and depletion," under subsection (b), "Basis for depletion," and subparagraphs (4) (A) and (B), provides, in pertinent part:

"(4) [As amended by § 145 of the Revenue Act of 1942, c. 619, 56 Stat. 798, and § 319(a) of the Revenue Act of 1951, c. 521, 65 Stat. 452] *Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits*

"(A) *In general.* The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

"(i) in the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, *marble* [emphasis added], sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum, (ii) in the case of coal, asbestos, brucite, dolomite, magnesite, perlite, wollastonite, *calcium carbonates,* [emphasis added] 10 per centum, (iii) in the case of metal mines, aplite, bauxite, fluorspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, saggar clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, *chemical grade limestone* [emphasis added], and potash, 15 per centum * *

\* \* \* \* \* \*

"of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

"(B) [As added by § 124(c) of the Revenue Act of 1943, c. 63, 58 Stat. 21, and amended by § 207(a) of the Revenue Act of 1950, c. 994, 64 Stat. 906, and § 304(d) of the Excess Profits Tax Act of 1950, c. 1199, 64 Stat. 1137.] *Definition of Gross Income from Property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but *also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products* [emphasis added], and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that

the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and saggar clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and *ores which are not customarily sold in the form of the crude mineral product* [emphasis added]—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of sections 450 and 453." (26 U.S.C. § 114, 1952 ed.)

The court below found essentially that what plaintiff was mining was neither marble (five per cent depletion) nor chemical grade limestone (fifteen per cent depletion), but calcium carbonate, with a ten per cent depletion rate.

A determination of this issue solves the third and fourth questions presented by these appeals,[2] and the third point urged by appellant as error.[3]

The district court in this case made the following finding:

"10. During the taxable years [which] ended April 30, 1951 and April 30, 1952, the calcium carbonate rock in plaintiff's said deposit was commonly regarded as and understood to be 'limestone' or 'calcium carbonates' and was not commonly regarded as or understood to be 'marble.' During the taxable years * * * said calcium carbonate rock was 'calcium carbonates' within the commonly understood commercial meaning of that term * * *. During the taxable years * * * it was not economically or commercially feasible to use any of said calcium carbonate rock in the production of dimension stone."

The government's position that the product was "marble" was taken for the first time at the pre-trial conference had after issue was joined. Appellee's tax returns have listed the material as "calcium carbonates" and the ten per cent depletion rate was originally claimed. On audit, this ten per cent rate for this material was approved by the government. No issue as to the proper percentage being other than ten per cent was made when the government original-

2. "3. Whether the District Court correctly held that the taxpayer's deposit is *calcium carbonate* (depletable at 10 per cent) rather than marble (depletable at 5 per cent) within the meaning of Section 114(b) (4) (A) of the 1939 Code."
"4. On the taxpayer's appeal the question is whether the deposit qualifies as chemical grade limestone under the Code, so that a 15 per cent depletion rate is

applicable." (From Brief for Dist. Director, p. 3.)

3. "3. The District Court erred in holding that the taxpayer's mineral deposit was 'calcium carbonates,' depletable at 10 per cent, rather than 'marble', depletable at 5 per cent, within the meaning of Section 114(b) (4) (A) of the Internal Revenue Code of 1939." (Brief for Dist. Director, p. 9.)

ly filed its answer. Appellee states that such position on percentage was first urged by the Department of Justice, rather than the Treasury Department, in Riverside Cement Co. v. United States, 2 A.F.T.R.2d 6175; that it was not taken in the first trial of Monolith Portland Cement Co. v. United States, D.C.S.D.Cal. 1958, 168 F.Supp. 692, nor on the appeal therein (9 Cir., 1959, 269 F.2d 629), and that the Treasury Department has not amended its regulations or its published rulings with respect to the nature of the product mined for cement production, as it allegedly has done in other industries.

But we need not tarry on the question of whether there are differing interpretations of legal problems within the Treasury Department and the Department of Justice any more than did the Supreme Court in Cannelton, supra, in considering administrative interpretations made by the Treasury Department. In Cannelton the Supreme Court preferred to rely on "authoritative congressional action itself." [364 U.S. 76, 80 S.Ct. 1587.] And here we have a record before us to search with the sole purpose of determining if there is evidence to support the trial court's finding; and whether that finding complies with the "authoritative congressional action" and the judicial interpretations thereof now existing, applicable to mineral identification under § 114(b) (4) (A).

The various minerals are named in the statute. "Marble" appears in subdivision (i), "calcium carbonates" in subdivision (ii), and "metallurgical" and "chemical grade limestone" in subdivision (iii).

■ We are satisfied there is sufficient evidence in the record to support the trial court's finding that the raw material here mined was "calcium carbonate." We are taught we must look to the commonly understood *commercial* meaning of the mineral named. United States v. Wagner Quarries Co., 6 Cir., 1958, 260 F.2d 907; South Jersey Sand Co. v. Com'r, 3 Cir., 1959, 267 F.2d 591; Virginian Limestone Corp. v. Com'r, 26 T.C. 553. H. Conf.Rep. No. 1213, 82d Cong.Sess., p. 75, S.Rep. 788, 82d Cong. 1st Sess., p. 38.

And see: United States v. Pacific Clay Products, 9 Cir., 1960, 285 F.2d 215, petition for rehearing denied April 27, 1961. This is not necessarily the scientific meaning. Marble is calcium carbonate, yet commercial marble and calcium carbonates are two different minerals, under the law.

The government at one time urged that the court follow the Commissioner's theory that the "end use" to which a product was put determines the identification of the mineral, but this is no longer urged by the government—quite the contrary. Virginian Limestone Corp. v. Com'r, supra; Wagner Quarries Co. v. United States, D.C.N.D.Ohio, 154 F. Supp. 655, affirmed 6 Cir., 260 F.2d 907; Spencer Quarries, Inc. v. Com'r, 27 T.C. 392.

We fail to see why the designation of "marble" is more *"specific"* than "calcium carbonates." It may be so "geologically" (from the earth's history) and "petrographically" (according to the classification of rocks), but that does not make it more specific in "the commercial meaning commonly understood in the trade." And that is the standard by which we measure for tax purposes.

Because the trial court expressed a feeling that the term "marble" as used in § 114(b) (4) (A) (i) probably referred to "dimension marble," from which ornamental statutes are frequently made, does not mean that all nondimensional marble produced could not have a commonly understood commercial meaning or identity as calcium carbonate. The fact that no dimensional marble was sold in California does not mean that the crushed marble which was sold in the California market could not be calcium carbonate.

As the government concedes (Brf., p. 33), the commercial nomenclature commonly accepted in the trade with respect to a particular deposit may vary according to the use to which the stone is put. But this cannot be done here, says the government, because our courts have rejected such theory, and have consistently held that deposits cannot be classified according to the end use. To classify

them solely by their end use is one thing —to classify them by their commonly understood commercial meaning is another, even though the latter may be shaped and influenced, in some smaller or larger degree, by the end use.

But irrespective of the above discussion and theory, here expert testimony was produced by both sides. Experts testified as to the geologic and end use distinctions. Government witnesses did not give credence to "suitability for use test" (so characterized by the government). The taxpayer's experts did rely on suitability of the product.[4] The government's experts concluded such a "test" could only end in chaos; "that many mineral deposits have different uses—different trade use, different terms." The government experts pointed out the Slover Mountain had in the past been mined for, and still retained some, dimension marble. The taxpayer's experts had as good reasons for their opinion that what remained in Slover Mountain was not deposit marble, and could not be used to produce dimension marble.

■ All conflict between experts as to commercial identity of the product has repeatedly been held peculiarly a matter for the determination of the trier of fact. Sartor v. Arkansas Natural Gas Corp., 1944, 321 U.S. 620, 621, 627, 64 S.Ct. 724, 88 L.Ed. 967; United States v. Sutro, 9 Cir., 1956, 235 F.2d 499, 502; Kieffer v. Blue Seal Chemical Co., 3 Cir., 1952, 196 F.2d 614; Steelco Stainless Steel, Inc. v. Federal Trade Commission, 7 Cir., 1951, 187 F.2d 693, 697; United States v. Alger, 9 Cir., 1934, 68 F.2d 592.

■ On the record before us we cannot rule the conclusion of the lower court was clearly erroneous. We cannot disturb its conclusion, and we affirm it.

By similar reasoning, we are satisfied that the findings of the court below upon which its conclusion that this was not chemical grade limestone (entitled to a fifteen per cent depletion rate) are not clearly erroneous, and are supported by the evidence. The total calcium and magnesium carbonate content was approximately eighty per cent—not high enough (at least in the eyes of some experts) to qualify the material as "chemical grade limestone."

Being satisfied with the identity of the product, determined by the trier of fact below to be "calcium carbonate" entitled to a ten per cent depletion rate, we turn to the question of the cut-off point.

We thereby treat the first point urged by appellant—that the court below erred in permitting the taxpayer to compute its percentage depletion allowance on gross income from finished cement, rather than "crushed stone." The government asserts "crushed stone" is "the commercially marketable mineral product" within the meaning of § 114(b) (4) (B) of the Internal Revenue Code of 1939. Appellant's second point is an alternative one—that even if cement and other finished products were "the commercially marketable mineral product" under the section quoted, there should be deducted from gross income that portion it was increased by sacking and the addition of mineral additives.

■ The legislative history of the theory of depletion allowance is completely explored in Cannelton, supra.[5] Starting with the production of oil and

---

4. The taxpayer's witnesses testified that to justify the designation of marble, a deposit must be a metamorphosed and recrystallized limestone which can be extracted in large blocks of approximately three by six feet which can be sawed and polished for market as dimension stone; that crushed marble products are those produced supplementary to a dimension stone operation; and, that it would not be commercially feasible to operate the taxpayer's deposit for dimension stone.

However, these witnesses conceded that marble is used primarily in small sizes, and that the only marble production in California is for crushed stone, not incidental to a dimension stone operation.

5. "In summary, mineral depletion for tax purposes is an allowance from income for the exhaustion of capital assets. Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277. In addition, it is based on the belief that its allowance

gas in 1926, the theory of percentage depletion was extended to "metal mines, coal, and sulphur" in 1932. This required a new concept—to determine the

encourages extensive exploration and increasing discoveries of additional minerals to the benefit of the economy and strength of the Nation. We are not concerned with the validity of this theory or with the statutory policy. Our sole function is application of the congressional mandate. A study of the materials indicates that percentage depletion first came into the tax structure in 1926, when the Congress granted it to oil and gas producers. The percentage allowed was based on 'gross income from the property,' which was described as 'the gross receipts from the sale of oil and gas as it is delivered from the property.' Preliminary Report, Joint Committee on Internal Revenue Taxation, Vol. I, Part 2 (1927). The report continued that, as to the integrated operator, 'the gross income from the property must be computed from the production and posted price of oil, as the gross receipts from a refined and transported product can not be used in determining the income as relating to an individual tract or lease.' The Treasury Regulations confirmed this understanding. Treas.Reg. 74 (1929 ed.), Art. 221(i), 241.

"Thereafter, in 1932, percentage depletion was extended to metal mines, coal, and sulphur. The mining engineer of the Joint Committee, Alex. R. Shepherd, urged in a report to the Congress that depletion for metal mines be computed, as in the oil and gas industry, on a percentage-of-income basis, and the Revenue Act of 1932 was so drawn. The Shepherd Report pointed out that the percentage basis for oil and gas depletion had been in force for over a year and had 'functioned satisfactorily both from economical and administrative viewpoints and without loss of revenue.' It added that 'careful study of this method as applied to metal mines indicates that the same results will be attained in practice as in the case of oil and gas,' but that, because of varied practices in the mining industry, it would be necessary to determine 'the point in accounting at which' gross income from the property mined could be calculated. It recommended that 'it is logical to peg "gross income from the property" f. o. b. cars at mine,' i. e., net smelter returns, recognizing that processing beyond this point should not be included in calculating 'gross income from the property.' While as to certain metals, viz., gold, silver, or copper, the report suggested that gross income should be based on receipts from

'the sale of the crude, partially beneficiated or refined' product, this was but to make provision for the specific operations of miners in those metals. In this regard the report also proposed that the depletion base 'in the case of all other metals, coal and oil and gas, [should be] the competitive market receipts, or its equivalent, received from the sale of the crude products, or concentrates on an f. o. b. mine, mill, or well basis.'

"The Congress in fashioning the 1932 Act took into account these recommendations. It incorporated a provision in the Act allowing percentage depletion for coal and metal mines and sulphur, based on the 'gross income from the property.' § 114(b) (4), Revenue Act of 1932, 47 Stat. 169. On the following February 10, 1933, the Treasury issued its Regulations 77, which defined 'gross income from the property' as 'the amount for which the taxpayer sells (a) the crude mineral product of the property or (b) the product derived therefrom, not to exceed in the case of (a) the representative market or field price * * * or in the case of (b) the representative market or field price * * * of a product of the kind and grade from which the product sold was derived, before the application of any processes * * * with the exception of those listed * *.' Treas.Reg. 77, Art. 221(g). These exceptions listed processes normally in use in the mining industry for preparing the mineral as a marketable shipping product. The regulation was of unquestioned validity and, in 1943, at the instance of the industry, the Congress substantially embodied it into the statute itself, 58 Stat. 21, 44, including the basic definition of the term 'gross income from the property.' Since that time the section on percentage depletion—§ 114(b) (4) (B) of the 1939 Code—has remained basically the same. Additional minerals have been added from time to time—shale and fire clay in 1951—until practically all minerals are included.

"As now enacted, the section provides that 'mining' includes 'not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products,' plus transportation from the place of extraction to the 'plants or mills in which the ordinary treatment processes are applied thereto,' not exceeding 50 miles. It then defines

point in accounting at which "gross income from the property" could be calculated, and it was suggested this point should be "f. o. b. cars at mine." Treasury Regulation 77 followed, and its provisions were incorporated into law in 1943 (58 Stat. 21, 44) and have "remained basically the same" (Cannelton, supra, 364 U.S. at page 84, 80 S.Ct. at page 1585; Int.Rev.Code of 1954, § 613, 26 U.S.C. § 613), and are now incorporated in § 114(b) (4) (B). This is set forth in its entirety earlier in this opinion. Recapitulated in Cannelton are the provisions of § 114(b) (4) (B): " 'Mining' includes 'not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied * * * to obtain the commercially marketable mineral product or products * * *.' " (Id., 364 U.S. at page 84, 80 S.Ct. at page 1585.)[6] Recognizing the difference in mining deposits, and the individual mining operations necessarily incident to the removal of such deposits, § 114(b) (4) (B) (i) to (iv) specifically interprets into four categories "ordinary treatment processes", the: first (i) for *coal,* which, for example, permits the "cleaning, breaking, sizing, and loading for shipment"; (ii) for *sulphur,* "pumping * * *, cooling, breaking, and loading for shipment"; (iii) for certain minerals named (such as iron ore), and other "customarily sold in the form of the crude mineral product," the "sorting, concentrating, and sintering to bring to shipping grade and form,

and loading for shipment"; and (iv) "ores * * * not customarily [so] sold" such as lead, zinc, copper, gold and silver. From all this, Cannelton teaches us the Congressional intent was that the depletion allowance is based on the *constructive income* from the *raw mineral product,* when *first marketable in that form.*

In Cannelton, "fire clay and shale" was a product not specifically named in § 114 (b) (4) (B). The government urged it came within subdivision (iii) of the section, "minerals * * * customarily sold in the form of a crude mineral product."

In deciding the government was correct—that the stopping point was "where the ordinary miner shipped the product of his mine," the Supreme Court referred to the Indiana market, and that three-fifths of the fire clay produced in Indiana was sold in its raw state; and additional large sales made across the river in Kentucky. This was significant, says Cannelton, not to establish the ability of "miners" to sell fire clay and shale in that market *profitably,* but that the mined product was ready for consumption—had "passed the 'mining' state on which the depletion principle operates." When then did the integrated processing of calcium carbonate into cement reach the point where it could be said that it should be treated "as if the operator was selling the mineral mined to himself for fabrication"? At what point did ordinary non-integrated miners dispose of their product?

'ordinary treatment processes' by setting out specifically in four categories those covering some 17 named minerals. Fire clay and shale are not within these specific enumerations. The Government, however, contends that they should come within clause (iii) of the section, which provides that, 'in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, *and minerals which are customarily sold in the form of a crude mineral product*—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment * * *' are included in 'ordinary treatment processes.' (Italics added.) Clause (iv) lists specific metals such as lead, zinc,

copper, etc., 'and ores which are not customarily sold in the form of the crude mineral product,' and specifically excludes from the permissible processes certain ones used in connection with these metals." United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, at pages 81-85, 80 S.Ct. at page 1584.

6. We note that "ordinary treatment processes" that help to produce the particular product a producer (particularly a fully integrated producer) sells are not necessarily included, but only those *ordinary* processes *normally* applied to obtain the *first* commercially marketable mineral product.

On seeking the answer to this question, we obviously eliminate the position originally urged by the California Portland Cement Company that the *total* proceeds derived from the sale of its products were the equivalent of the "gross income from the property." This is at least tacitly recognized in their supplemental brief when they say the allowable processes under subdivision (iv) of § 114(b) (4) (B) include "crushing and grinding," but "not calcination and subsequent processing,"[7] and by appellee's position that the "kiln feed cut-off point" is proper.[8]

Cannelton, supra, is not controlling, urges appellee, because it dealt with fire clay and shale, a mineral product "customarily sold in the form of a crude mineral product," i. e., a group (iii) classification, while calcium carbonate or limestone is *not* customarily so sold, and hence falls within group (iv) of subparagraph (B).

Amicus Curiae, Monolith Portland Cement Company, urges that the calcium carbonate rock here involved falls *neither* into class (iii), "customarily sold in the form of the crude mineral product," because it is not so sold, or (iv), "ores * * * not customarily sold in the form of the crude mineral product," because it is not ore. This class—"not marketable in any form before put into the form of a manufactured end product"—allegedly should include cement rock, and should be considered not classifiable under § 114(b) (4) (B) (i) to (iv), inclusive, under the general language of § 114(b) (4) (B)—i. e., the gross income from "mining" includes "not merely the extraction of the * * * minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral * * * products," plus certain transportation.

Certainly the cost of those "ordinary treatment processes" specifically mentioned in the statute must be allowed as part of the cost of producing the marketable product. Thus if calcium carbonate falls within (iii), then *sorting, concentrating, sintering, and loading for shipment* are proper items to be included, if any such treatment has taken place. If calcium carbonate falls within (iv), then "crushing, grinding, and beneficiation by concentration * * *, cyanidation, leaching, crystallization, [and] precipitation * * *," or substantially equivalent processes (not falling within the specific prohibitions contained in (iv)) are properly includible as an ordinary treatment process.

Thus the cost of crushing and grinding is allowable if (iv) governs, but is not if (iii) governs.

We do not decide whether the Supreme Court in Cannelton drew any distinction between the "minerals" of § 114(b) (4) (B) (iv) and the "ores" of § 114(b) (4) (B) (iii). The correction made in the Court's original opinion maintains the specified distinction in (iii) and (iv). After discussion of both, the Court lumps both as the product of mining and concludes that "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles." Cannelton, supra, 364 U.S. at page 86, 80 S.Ct. at page 1586. In so stating, we do not read the opinion as eliminating "ores" from "raw mineral products."

The fire clay and shale in Cannelton fell into § 114(b) (4) (B) (*iii*). There was there a local market. But here, urges appellee, there was not only no *profitable market* in any form of product "ready for industrial use or consumption" until the addition of "shale, iron ore, quartzite, gypsum, and Phillip's shale and various purchased nonmineral materials" added by appellee to its calcium carbonate rock in the production of its cement clinker and finished cement (Finding No. 15, Tr. 139), but no market whatsoever created until those additions had been made—i. e.,

7. Supplemental Brief of Appellee, California Portland Cement Company, p. 4.

8. Supplemental Brief of Appellee, California Portland Cement Company, pp. 22, et seq.

"it * * * [the raw mined product] * * * was not marketable at all." (Supp. br., p. 22.)

For that reason, appellee urges, under Cannelton, appellee is entitled to compute its gross income by the proportionate costs and profits method on the basis of the kiln feed cut-off point. What is "customary" is to be determined by reference to the particular situation *within the taxpayer's local market area.* This is required by Cannelton, says appellee, because the Supreme Court, in rejecting the "profitability" test, states that "the substantial tonnage being sold in a raw state provides conclusive proof that [the mineral is] * * * ready for industrial use or consumption," *i. e.,* has "passed the 'mining' state on which the depletion principles operates [sic]." 364 U.S. 76, at page 86, 80 S.Ct. 1581, at page 1587.

But we do not read Cannelton so narrowly as to hold that marketability is to be tested *solely* by the existence or nonexistence of a local market. "Obviously" says the Supreme Court (in quoting with approval testimony given at the hearings before the Senate Special Committee on the Investigation of Silver (77th Cong.2d Sess., p. 764)) "it was not the intent of Congress that those processes which would take your products and make them into different products having very different uses should be considered, as the. basis of depletion." Cannelton, supra, 364 U.S. at page 87, 80 S.Ct. at page 1587.

The court below made findings based on a cut-off date held erroneous by Cannelton. The district court allowed computation of the depletion base by reference to the finished products produced by the taxpayer. It therefore made no findings upon which "proper," as determined by Cannelton, computations can be based.

This case, therefore, would ordinarily be remanded for computation of the dollar amount of the depletion allowance based upon the proper cut off point. Cf. United States v. Pacific Clay Products Co., 9 Cir., 1960, 285 F.2d 215. But by reason of the passage of Public Law 86–781 (74 Stat. 1017, at page 1018), and more particularly § 4 thereof, 26 U.S.C.A. § 613 note, the appellee was given (and has notified this court that it has exercised) the option to take the kiln feed cut-off point as to all taxable years here involved. That renders a determination of the proper cut-off point moot in this case.

We believe the government's position correct when it stated to this court, after such election:

"Insofar as the judgment of the District Court is based upon the taxpayer's claim that it is entitled to depletion on cement (including additives and sacking), the judgment is moot and therefore should be reversed. The taxpayer's election under the recent legislation (Section 302(c) of the Public Debt and Tax Rate Extension Act of 1960 (Public Law 86–564, 74 Stat. 293), as amended by Section 4 of Public Law 86–781, 74 Stat. 1018 * * *) applies to calcium carbonates and other minerals mined by the taxpayer 'when used to make cement' and as to such minerals both permits the taxpayer to use the pre-kiln feed stage as the cut-off to 'mining' (instead of the crushing stage which we contend would otherwise be applicable) and precludes the taxpayer from obtaining depletion on the basis of the sales price of its cement. The taxpayer's election thus has a major effect upon the judgment of the District Court. It does not, however, inject any new question into the case."

The judgment is *affirmed* with respect to the identity of the product, and the percentage of depletion found applicable by the trial court. It is *reversed* as to the cut-off point, and *remanded* to the district court for the making of new findings and conclusions, and the entry of a judgment consistent with the teachings of Cannelton, supra, and with this opinion in those areas, if any, where Cannelton does not control, and with the election made by California Portland Cement Company.