PACIFIC CLAY PRODUCTS, Appellant,
v.
UNITED STATES of America,
Appellee.
No. 18443.

United States Court of Appeals
Ninth Circuit.
May 8, 1964.

---

Parker, Milliken, Kohlmeier, Clark & O'Hara, Harrison Harkins, Los Angeles, Cal., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Michael Mulroney, Attys., Dept. of Justice, Washington, D. C., Francis C. Whelan, U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Section, Los Angeles, Cal., for appellee.

Before BARNES, JERTBERG and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is an appeal in an action by Pacific Clay Products Corporation to recover income taxes paid in 1951 and 1952.

The question is whether, for depletion allowance purposes, the trial court improperly classified as "brick and tile clay" rather than "refractory and fire clay" certain clays owned and mined by Pacific. The respective tax allowances to an owner who mines these clays are 5% and 15% of his gross income from mining. I.R.C.1939, Sec. 114(b) (4) (A) (i) and 114(b) (4) (A) (iii). (26 U.S.C. 114(b) (4) (A) (i) and 114(b) (4) (A) (iii) (1952).

On a prior appeal of the case [United States v. Pacific Clay Products, 285 F.2d 215 (9th Cir.1960)] this court held that the definition published by the American Society for Testing Materials (ASTM) was the one generally accepted and used in the industry to classify a clay as refractory and fire clay; that the classification and nomenclature of clay used in the statute were intended by Congress to have and to be applied in their commonly understood commercial meaning; and that a number of factors must be considered in determining whether a clay came within that definition.[1] Concluding that the trial court had classified the taxpayer's several clays solely on the basis of their pyrometric cone equivalency (PCE) ratings,[2] rather than on the ASTM definition, we reversed the judgment and remanded the cause with directions to employ the correct standard.

After further proceedings, following remand, the trial court expressly stated in its memorandum opinion [D.C., 200 F.Supp. 18, (1961)] that "too much emphasis was (previously given to the PCE test. It is now realized by the court that this PCE test must be regarded, as it is, as being a part of the factors considered * * * in determining the qualification

---

1. The definition of "fire clay" as established by American Society for Testing Materials is:

"An earthy or stony mineral aggregate which has the essential constituent hydrous silicates of aluminum, with or without free silica, plastic when sufficiently pulverized and wetted, rigid when subsequently dried, and of suitable refractoriness for use in commercial refractory products."

2. The degree of refractoriness or resistance to heat of mineral oxides is generally expressed in terms of "Pyrometric Cone" equivalency. This refers to a standard of measure employed by the ceramic industry. "In this country there has been developed a series of standard test cones * * * which are made from heat resisting materials in prescribed shapes and which when heated under prescribed conditions will soften and bend so that the tip end of each standard cone will touch the supporting plaque at predetermined degrees of effective heat. There are sixty or more of the standard cones ranging from Cone 022 down through Cone 01 and then ranging from Cone 1 through Cone 42." (Brief of Taxpayer p. 9).

of the clays in question under the fire clay definition published by the American Society for Testing Materials." In exposition of the definition the court said that it was composed of two parts, the first ending with the word "dried"; that this portion required not only that a particular clay contain some hydrous silicates of aluminum (for this is common to clays generally) but that the clay possess such constituent elements "to a high degree." Continuing, the court said that the second part of the definition which reads "of suitable refractoriness for use in commercial refractory products" meant "of such suitable capacity to resist (high temperature) for use in commercial products, which as such resist ordinary treatment, such as breaking or being damaged by the hazards of heat and ordinary use."

The trial court then found that of the six clays remaining in issue the taxpayer's Lower Douglas, Upper Douglas and Pacific Red were fire clays, but its Murphy, Valley Springs and Harrington Red were brick and tile clays.[3] Judgment was entered accordingly. Taxpayer alone has appealed. Its attack, of course, is directed to the classification assigned to the last three designated clays.

Taypayer's thesis is that " * * * the District Court erroneously interposed its own definition of 'fire clay' in place of the definition approved by this court in the prior appeal * * *." More particularly, it argues that in the first part of the definition the District Court " * * * inject(ed) the element of relative chemical analysis" and that in the second "added the additional requisite that in order to be a 'fire clay' the clay must contribute to a resistance to damage or breaking in the finished product."

We believe that the district court did nothing more than interpret (and we think permissibly) the definition in order to determine its scope and meaning. Both fire clay and tile clay contain hydrosilicates of aluminum and possess the physical characteristics mentioned in the first part of the ASTM definition.[4] But some narrowing construction of the broad scope of that reference is clearly indicated, for otherwise the test would be largely one of refractoriness of the material—the very proposition we rejected in the earlier appeal when we pointed out that refractoriness, the measurement of which was the PCE test,—was simply one of several factors to be considered. Several of taxpayer's witnesses explained that fire clays were "high grade" clays while brick clays were "lower grade" clays and the district court decided this statement was with reference to the respective quantities of "the essential constituent hydrous silicates of aluminum * * *" present in either type of clay, and their relative plasticity. And in view of the experts' testimony, we think such an interpretation was fully justified.

Passing to the second part of the ASTM definition, the district court held that it included not only the requirement that the clay be resistant to heat—a quality that was determined by applying the PCE test—but that the language of the definition that the clay be suitable "for use in commercial refractory products"

3. Initially the dispute involved eleven clays from the following designated pits:

    Dosch
    Harrington Red
    Irvine
    Los Nietos
    Lower Douglas
    Murphy
    Pacific Red
    South Pit Red
    South Pit White
    Upper Douglas
    Valley Springs

In the district court the parties stipulated that Dosch, South Pit White and South Pit Red were fire clays, and that Los Nietos and Irvine were brick clay. They further stipulated that any of the others not found to be fire clays should be classed as brick clay; it was on the basis of this stipulation that the trial court classed Murphy, Valley Springs and Harrington Red as brick clays.

4. Taxpayer's expert witness so testified, and his opinion was accepted by the district court.

also contemplated a consideration of its utility.

Factual support for this construction appears in expert testimony that an essential feature of a fire clay is its adaptability to practical use in commercial products that are designed to withstand high temperatures. Closely related is the district court's further holding that refractory clays must " * * * resist ordinary treatment such as breaking or being damaged by the hazards of heat and ordinary use." Taxpayer argues that the court erred because many clays recognized as refractory " * * * might be so lacking in plasticity that a refractory product made solely from [them] would shatter into fragments unless handled as gently as a new born babe." Taxpayer misinterprets the court's language. It is clear that the court was referring to the resistance to the spalling and break resistant quality of clay when put to a commercial use and not (as taxpayer urges) to an inherently fragile characteristic of a structure.

So much for the meaning of the definition; we turn next to its application.

As already indicated, it appears from the evidence that clays, in their natural state, all contain impurities and are generally comprised of a number of minerals in combination; that the principal constituents are silica, aluminum oxide and iron oxide and that, in order to constitute a fire grade clay, these components must be present in proper ratio to one another. A relatively high concentration of aluminum oxide is essential to such clay, but if the relative amount of either of the other two minerals is so large or small in proportion to the whole as to upset the balance, then a particular clay cannot be deemed fire clay either because it lacks resistance to heat or is unsuitable for commercial use or for both reasons.[5]

To show that the district court erred, the taxpayer resorts to a comparison of features possessed by those clays that were found or stipulated to be fire clays, with features present in the three clays involved in this appeal. And in this manner taxpayer demonstrates that the latter clays were of as good or better quality than the ones that were held to be fire clays. However, taxpayer's method, although quite ingenious, is faulty. Its vice lies in the fact that no two of the clays are the same. Their components are, but the relative proportions of these components are not. And this is particularly true of the fire clays. What taxpayer has done is to construct from the several fire clays a composite, singling out from each only those percentages and characteristics which are met by the three clays under consideration. But obviously this cannot be accepted, for no one component or characteristic can determine the character of a clay; rather, as we said on the former appeal, the determination must rest upon a consideration of all the factors in combination and as they are inherent in a particular clay. Some clays that are deficient in, or contain an excess of one or more of the essential components, may nevertheless be fire clays because of the compensating effect of other factors which bring such clays within the ASTM definition. However, there was substantial evidence here

5. For example, a brick made of clay containing a high percentage of silica is subject to cracking due to the volumetric changes in the silica when heated and then cooled. Similarly too much iron oxide in a clay renders brick containing it liable to decrepitation—that is, melting when subjected to high temperature, Additionally, the iron oxide has a tendency to attract carbon particles contained in the gasses given off by the fuel burned in a furnace. This phenomenon and its consequences were depicted thus by one of the government's expert witnesses, Peter D.

Johnson. This witness, who held the degree of Doctor of Science in ceramics from the Massachusetts Institute of Technology, stated that:

" * * * these carbon particles start growing and they swell and it, the brick, falls apart into sand. I came on a case like this in Seattle * * * and before the boiler they built ever got into operation the whole Dutch oven section of this boiler broke up; the bricks were no longer bricks, they were sand, and the reason was traced back to too high an iron content."

that this was not true of taxpayer's Murphy, Valley Springs and Harrington Red, and that they were properly classified as brick and tile clays.[6]

The judgment is affirmed.

---

6. The record is replete with evidence consisting of the testimony of experts. Their opinions, although based largely upon figures and other facts that are stipulated, are conflicting. We see nothing gained by epitomizing them. To do so would add little, but would necessarily require a statement of percentages and other details serving only to unduly lengthen this opinion. And it was of course for the district court, rather than for us, to weigh the evidence and to resolve those conflicts. We merely observe that the district court preferred the evidence which supported the government, and such was its prerogative. U. S. Pumice Supply Co. v. C. I. R., 308 F.2d 766 (9th Cir. 1962). In making this statement we are not unmindful of the two Revenue Rulings which the taxpayer relies upon as a persuasive proof that the three clays should have been classified as fire clays.

The first of these Rulings, Rev.Rul. 54–550, 1954–2 Cum.Bul. 164 (revoked in 1956 by Rev.Rul. 56–59, 1956–1 Cum.Bul. 626), indicates that "a clay will be considered a 'refractory clay' if it had a pyrometric cone equivalent of 15 or higher." All taxpayer's disputed clays were rated between PCE 16 and 17. [The govern-

ment witnesses declared that a minimum figure should be PCE 19]. However, accepting the lower figure and even assuming the revocation is of no significance, to the extent the earlier ruling suggests the PCE test is exclusive, it is contrary to our decision in the former appeal in this case.

The second, Rev.Rul. 56–59, 1956–1 Cum.Bul. 626, is claimed to recognize that fire clay must be used in manufacturing vitrified sewer pipe to enable the pipe to retain its shape and dimensions during kilning and that so used, a clay is considered to be a fire clay used for a refractory purpose. In the manufacture of sewer pipe, the taxpayer adds its Murphy, Valley Springs or Harrington Red clays to the blend or mix of clays so that the pipe will not change when exposed to the high temperature necessary to its vitrification. However, taxpayer itself readily recognizes that the end use to which a mineral is or may be put at most affords some evidence of its classification for depletion allowance purposes and is not alone dispositive of the issue. Riddell v. California, Portland Cement Co., 297 F.2d 345 (9th Cir. 1962).