413 F.2d 161
 69-2 USTC P 9447, 69-2 USTC P 9509
 UNITED STATES of America, Appellant,
v.
CALIFORNIA PORTLAND CEMENT COMPANY, a corporation,
Successor-in-Interest to Arizona Portland Cement
Company, a corporation, Appellee.
CALIFORNIA PORTLAND CEMENT COMPANY, a corporation,
Successor-in-Interest to Arizona Portland Cement
Company, a corporation, Cross-Appellee,
v.
UNITED STATES of America, Cross-Appellant.
UNITED STATES of America, Appellant,
v.
CALIFORNIA PORTLAND CEMENT COMPANY, Appellee.
CALIFORNIA PORTLAND CEMENT COMPANY, Cross-Appellant,
v.
UNITED STATES of America, Cross-Appellee.
 Nos. 22397, 22397-A, 22398, 22398-A.
 United States Court of Appeals Ninth Circuit.
 June 4, 1969, Rehearing Denied July 1, 1969.
 
 Grant W. Wiprud (argued), Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Robert Livingston, Attys., Dept. of Justice, Washington, D.C., Wm. Matthew Byrne, Jr., U.S. Atty., Loyal E. Keir, Asst. U.S. Atty., Los Angeles, Cal., for appellant.
 Stuart T. Peeler (argued), Joseph D. Peeler, Peter C. Bradford of Musick, Peeler & Garrett, Los Angeles, Cal., for appellee.
 Before BARNES, DUNIWAY and ELY, Circuit Judges.
 BARNES, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the district court awarding taxpayer a refund of income taxes previously paid for the taxable years ending April 30, 1953 to 1959, inclusive. The district court had jurisdiction pursuant to 28 U.S.C. 1346(a)(1) and 1402(a)(1), and we have jurisdiction of the appeal under 28 U.S.C. 1291.
 
 
 2
 Initially, the taxpayer maintains that the government is collaterally estopped in the present case from attacking the depletion computation previously determined in litigation involving the taxable years ending April 30, 1951 and 1952. On two prior occasions, this court considered questions arising out of that controversy, and our opinions are reported at (Riddell v. California Portland Cement Co.), 297 F.2d 345 (1962) and 330 F.2d 16 (1964). The several opinions of the district court are unofficially reported at 3 A.F.T.R.2d 438 (S.D.Cal.1958), 17 A.F.T.R.2d 782 (S.D.Cal.1962), and 18 A.F.T.R.2d 5424 (S.D.Cal.1965). The last citation sets forth the method of determining the depletion allowance finally adopted in the 1951-1952 litigation, taking into account this court's two prior decisions in the case.
 
 
 3
 In light of the clear language of the district court in its final disposition of the 1951-1952 litigation, the taxpayer's claim in the instant case of collateral estoppel would appear to be without foundation. Finding of Fact No. 33, entered in the 1965 'stipulated' decision, (p. 5425) stated as follows:
 
 
 4
 '33. By agreeing to the entry of the foregoing Findings of Fact and the following Conclusions of Law, the defendant has not waived his objections thereto nor does the defendant concede the correctness thereof either for the taxable years in suit or subsequent taxable years. Defendant has stipulated to the entry thereof to avoid another trial for the taxable years involved and so that final Findings of Fact and Conclusions of Law and a final Judgment may be entered without further delay. As to certain of the costs relating to the handling of additives ($21,390.00 for the taxable year ended April 30, 1951 and $14,321.00 for the taxable year ended April 30, 1952) herein treated as mining costs (see Finding of Fact No. 30, supra, Conclusion of Law No. 6, infra, and the computations shown in Exhibit A attached hereto), the defendant has not waived his objection thereto nor conceded the correctness thereof but has stipulated to such computations in order that final Findings of Fact and Conclusions of Law, and a final Judgment may be entered for the taxable years in suit without further delay.'
 
 
 5
 It is well established that a judgment based on the parties' stipulation is only res judicata as to the period covered by the action, and is not entitled to collateral estoppel effect in an action for a later period. United States v. International Bldg. Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 157, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); Erickson v. United States, 309 F.2d 760, 768, 159 Ct.Cl. 202 (1962); Clark v. United States, 281 F.2d 443, 446 (150 Ct.Cl. 470 (1960)); Seaboard Air Line R.R. Co. v. George F. McCourt Trucking, Inc.,277 F.2d 593, 596-597 (5th Cir. 1961); Brawner v. Pearl Assurance Co., 267 F.2d 45, 47 (9th Cir. 1958); Abarr v. United States, 153 F.Supp. 387, 389, 139 Ct.Cl. 748 (1957).
 
 
 6
 The taxpayer's modes of production as they are relevant to the issues raised on this appeal are fully set out in our opinion in Riddell v. California Portland Cement Co., 297 F.2d 345 (9th Cir. 1962), and need not be repeated here.[1] On the present appeal, the government contends that the court below erred with regard to the tax treatment of the following items: (1) costs of handling additives-- whether these are mining or nonmining costs; (2) costs of bags and bagging-- whether these are to be included when computing the cost of the first commercially marketable product; (3) selling expenses-- whether these are to be excluded in computing the depletion allowance and, if not, whether they are both mining and nonmining expenses, or only nonmining; and (4) discounts given by taxpayer on the sale of its cement-- whether these are trade or cash discounts. We will consider each of these items separately, in the context of the applicable code provisions, regulations and case law.
 
 
 7
 Initially, we note that taxpayer made a timely election pursuant to Pub.L. 86-781 4, 74 Stat. 1017, 1018, 26 U.S.C. 613 note to have all the taxable periods here in question governed by section 613 of the Internal Revenue Code of 1954, as amended by section 302(b) of the Public Debt and Tax Rate Extension Act of 1960, Pub.L. 86-564, 74 Stat. 293. Thus, taxpayer's depletion allowance is to be determined by reference to the pre-kiln-feed cutoff point referred to in 26 U.S.C. 613(c)(4)(F).
 
 
 8
 Under 26 U.S.C. 611(a), the taxpayer is entitled to a reasonable allowance for depletion 'in all cases to be made under regulations prescribed by the Secretary (of the Treasury) or his delegate.' Pursuant to this authority, the Treasury Department on July 26, 1968, promulgated Treasury Regulations 1.613, and more particularly 1.613-3, relating to percentage depletion, applicable to taxable years beginning after December 31, 1953. See 33 Fed.Reg. 10692-10699 (1968). Such regulations may be given retroactive application. 26 U.S.C. 7805(b). Dixon v. United States, 381 U.S. 68, 71-74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); Pollack v. Commissioner of Internal Revenue, 392 F.2d 409 (5th Cir. 1968); United States v. Fenix & Scisson, Inc., 360 F.2d 260, 267 (10th Cir. 1966). Further, when treasury regulations are reasonable interpretations of the statute in question, and are issued pursuant to statutory authority and are necessary to make the statute effective, they have the force and effect of law. Commissioner of Internal Revenue v. South Tex. Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 656 (5th Cir. 1968); Weyerhaeuser Co. v. United States, 395 F.2d 1005, 1008 (Ct.Cl.1968); Estate of Willett v. Commissioner of Internal Revenue, 365 F.2d 760, 761 (5th Cir. 1966); United States v. D.I. Operating Co., 362 F.2d 305, 308 (9th Cir. 1966), cert. denied, 385 U.S. 1024, 87 S.Ct. 742, 17 L.Ed.2d 673 (1967); United States v. Fisher, 353 F.2d 396, 398-399 (5th Cir. 1965); Whirlwind Mfg. Co. v. United States, 344 F.2d 153, 156 (5th Cir. 1965). See also Nutt v. Commissioner of Internal Revenue, 351 F.2d 452, 454 (9th Cir. 1965).
 
 
 9
 In the instant case, we conclude that the new regulations promulgated pursuant to 26 U.S.C. 611 and 613 constitute a valid exercise of the Secretary's power. Therefore, taxpayer's liability for the last five of the tax years now in question-- those ending April 30, 1955 to 1959, inclusive-- is to be determined with reference to the new regulations (which were not considered in the prior litigation, or in the court below in the present proceedings, or in the parties' briefs on this appeal). Taxpayer's liability for the years ending April 30, 1953 and 1954, respectively, is to be determined with reference to Treasury Regulations 118, 39.23(m)-1(e)(2) and (3), promulgated under the Internal Revenue Code of 1939. Both the old and the new regulations provide for the use of the proportionate profits method as an alternative method of computing gross income from nining, when there is no representative market price for the mineral product at the mining cutoff point, as in the instant case. The new regulations do not change the method, but set forth more specific applications of the method, as it relates to particular items in the cost computation, than are contained in the earlier regulations. This we will discuss in relation to the several issues raised on this appeal.
 
 
 10
 The government and the taxpayer are here agreed that the mineral with which we are concerned for depletion allowance purposes in calcium carbonate. Thus, the district court correctly held in Conclusion of Law No. 4 (C.T. 188) that the appropriate allowance for the taxable year ended April 30, 1953 and for the first 245/365 ths of the year ended April 30, 1954 is 10 per cent of the taxpayer's gross income from mining. Internal Revenue Code of 1939, section 114(b)(4)(A)(ii), as amended. That court correctly held also that the applicable allowance for the remainder of the taxable year ended April 30, 1954 and for the years ended April 30, 1955 through 1959, inclusive, is 15 percent of the taxpayer's gross income from mining. 26 U.S.C. 613(b)(7), and (d).
 
 I. COSTS OF HANDLING ADDITIVES
 
 11
 The first question we must decide is whether the taxpayer's costs of handling the materials its added to its mined calcium carbonate rock are mining or non-mining costs, for purposes of computing the depletion allowance. The government maintains that these costs are not allocable to the mining operation, and that the district court's findings and conclusions in this regard are erroneous. Finding of Fact No. 14 (C.T. 182-183) stated the following:
 
 
 12
 'The mineral materials iron ore and quartzite were added by plaintiff to its calcium carbonate rock in the production of its cement clinker and finished cement. Said minerals were added in the raw grinding stage prior to the introduction of the raw mix into the kiln, and such process was an essential step in the production of cement clinker and finished cement from plaintiff's calcium carbonate rock. Subsequent to acquisition by plaintiff but prior to actual admixture with plaintiff's calcium carbonate rock, said mineral materials were stored on plaintiff's premises and then moved to the point of admixture. Such storage and handling was a necessary part of the process of mixing said mineral materials with plaintiff's calcium carbonate rock prior to introduction into the kiln, and the cost of such storage and handling should be treated as a mining cost under the (proportionate profits method).'
 
 Conclusion of Law No. 5 (C.T. 189) stated:
 
 13
 'All of the processes applied by plaintiff to its calcium carbonate rock prior to the kiln-feed point, including the cost of physical addition of iron ore and quartzite (and their related storage and handling costs) in the raw grinding stage, were 'ordinary treatment processes normally applied by mine owners and operators' and 'mining' within the meaning of Section 114(b)(4) of the Internal Revenue Code of 1939, as amended, and Section 613(c) of the Internal Revenue Code of 1954, as amended.'
 
 
 14
 The starting point for our analysis must be the Internal Revenue Code of 1954, as amended in 1960. Section 613(c)(4) therein provides:
 
 
 15
 'The following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to the ore or mineral in respect of which he is entitled to a deduction for depletion under section 611.'
 
 
 16
 Paragraph (F) thereunder (26 U.S.C. 613(c)(4)(F)) provides that 'in the case of calcium carbonates and other minerals when used in making cement-- all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the kiln, but not including any subsequent process,' shall be considered as mining. Section 613(c)(5) states that blending with other materials shall not be considered as mining, unless otherwise provided for in paragraph (4), or necessary to processes so provided for.
 
 
 17
 The regulations under the 1939 Code, as relevant here, provide that the term 'mining' as used therein 'includes not only the extraction of ores or minerals from the ground but also the ordinary treatment processes which are normally applied by the mine owners or operators to the crude mineral product after extraction in order to obtain the commercially marketable mineral product or products.' Treas.Reg. 118, 39.23(m)-1(e)(2). They also specify that the blending with other material is not included in the term 'ordinary treatment processes' unless such a process is otherwise provided for, or necessary to a process otherwise provided for, or necessary to bring the ores or minerals into condition suitable for shipment. Treas.Reg. 118, 39.23(m)-1(f)(2).
 
 
 18
 The latter provision was carried over into the new regulations, substantially unchanged. Proposed Treas.Reg. 1.613.3(g)(1), 33 Fed.Reg. 10698 (1968). It also provided in said new regulations that:
 
 
 19
 'The term 'mining' does not include purchasing minerals from another. Accordingly, the processes listed in this paragraph shall be considered as mining processes only to the extent that they are applied by a mine owner or operator to an ore or mineral in respect of which he is entitled to a deduction for depletion under section 611. The application of these processes to purchased ores, minerals, or materials does not constitute mining.' Proposed Treas.Reg. 1.613-3(f)(2)(iv), 33 Fed.Reg. 10697 (1968).
 
 
 20
 The above regulation is consistent with the Committee Report prepared in connection with Public Law 86-564 (June 30, 1960), wherein it is stated that under the new paragraph (4) of section 613(c), quoted above, 'a described process is not treated as mining where applied to a purchased ore or mineral.'
 
 
 21
 It is a general rule of construction that when a statute is part of an organic whole, the statute should be viewed in context with the whole of which it is a part. Stanford v. Commissioner of Internal Revenue, 297 F.2d 298, 308 (9th Cir. 1961). Thus, the various subsections of 26 U.S.C. 613(c) must be construed, if possible, as consistent and interrelated parts of a single statutory scheme.
 
 
 22
 With this background, we turn to the specific facts of the case, bearing in mind that we are here concerned only with the computation of the depletion allowance on taxpayer's calcium carbonate. The taxpayer maintains that the costs of storing and handling its additives must be allocated to mining because these costs are incurred prior to the cutoff point provided for in 26 U.S.C. 613(c)(4)(F), that is, prior to the introduction of the kiln feed into the kiln. The taxpayer also contends that these storing and handling costs are analogous to the blending activities which were considered to be mining costs in Riddell v. California Portland Cement Co., 330 F.2d 16, 18 (9th Cir. 1964). (Said costs of physical addition or blending are not involved here.)
 
 
 23
 To the contrary, the government maintains that on the authority of the language of 613(c) and the holding of this court in Riddell v. California Portland Cement Co., 330 F.2d 16 (1964), the costs of storing and handling additives must be allocated to the nonmining portion of taxpayer's activities.
 
 
 24
 We hold the contentions of the government are correct. The quartzite added by taxpayer was purchased, while the iron ore was mined by the taxpayer. For the ore, the taxpayer is entitled to a depletion allowance separate and apart from the allowance on the calcium carbonate. However, for the purpose of computing the depletion allowance on the calcium carbonate, we hold that only processes applied to the calcium carbonate prior to its introduction into the kiln, as one of the components of kiln feed, may be considered as processes of mining calcium carbonate. This construction does justice to 613(c) as a whole, by allowing processes applied to the calcium carbonate to be treated as mining, while at the same time taking into account the kiln feed cutoff point. The holding is also consistent with the applicable regulations; it precludes a process incidental only to blending and the production of cement from being treated as mining, and prevents double depletion (with regard to the iron ore) and depletion on purchased minerals (with regard to the quartzite).
 
 
 25
 Further, this holding accords with past decisions of this and other courts. In United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 78, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), the Court stated that the 'ordinary treatment processes' contemplated by the statute are those normally applied by nonintegrated miners engaged in the recovery of the minerals. As the court below found in the present case, the addition of minerals to taxpayer's calcium carbonate 'was an essential step in the production of cement' and the storage and handling of these minerals 'was a necessary part of the process of mixing said mineral materials' with the mined calcium carbonate. Thus, the handling and storage costs were incurred only because taxpayer is an integrated producer, and said costs were not incurred in order to recover the calcium carbonate. The Court in Cannelton also stated that none of the processes to be treated as mining 'destroy the physical or chemical identity of the minerals or permit them to be transformed into new products' (Id. at 86, 80 S.Ct. at 1586); that when the minerals 'are in such a state that they are ready for industrial use or consumption * * * they have passed the 'mining' state on which the depletion principle operates' (Id.); and that gross income from mining stops where the ordinary miner ships the product of his mine (Id. at 87, 80 S.Ct. at 1587). This language provides further authority for our conclusion above. See also Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 539, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963); Riddell v. California Portland Cement Co., 297 F.2d 345, 355 (9th Cir. 1962); Virginia Greenstone Co. v. United States, 308 F.2d 669 (4th Cir. 1962); Iowa Limestone Co. v. United States, 365 F.2d 63 (8th Cir. 1966); Solite Corp. v. United States, 375 F.2d 684 (4th Cir. 1967).
 
 
 26
 We find additional support for holding that the costs of handling and storing additives are not to be treated as costs of mining calcium carbonate in the decision of this court in Riddell v. California Portland Cement Co., 330 F.2d 16 (1964). We therein held that a cost was not to be regarded as mining simply because it was incurred during the pre-kiln stage; that depletion allowance was to be computed separately with each component mineral in order to avoid double depletion and depletion on purchased minerals; and noted that only treatment processes applied to the mineral (here, calcium carbonate) are to treated as mining. Hence, for the reasons herein stated, we reverse the judgment of the district court with regard to taxpayer's additives.
 
 II. COSTS OF BAGS AND BAGGING
 
 27
 The next question is whether taxpayer's costs of bags and bagging for its finished cement are to be included when computing the cost of the first commercially marketable product or products under the proportionate profits method. The government argues that the costs of bags and gagging, and the profits resulting from sales of bagged cement, should be included in the equation used to determine the depletion allowance.[2] The taxpayer maintains that these costs and profits should be excluded from the formula, in accordance with Finding of Fact No. 21 of the district court (C.T. 184-185), and contends, in the alternative, that if these items are included then said costs should be allocated to both mining and manufacturing. Finding of Fact, No. 21, stated:
 
 
 28
 'The first commercially marketable product obtained from the calcium carbonate rock used in plaintiff's cement plants was bulk cement. Both the additional income attributable to plaintiff's selling a portion of its products in sacks rather than in bulk and the additional costs incurred as a consequence of selling such portion in sacks rather than in bulk are to be excluded in the computation of plaintiff's percentage depletion allowances for the taxable years ending April 30, 1953, April 30, 1954, April 30, 1955, April 30, 1956, April 30, 1957, April 30, 1958, and April 30, 1959.'
 
 
 29
 Section 613(a) of the Internal Revenue Code of 1954, as amended in 1960, provides that in the case of mines and other natural deposits, the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property. Section 611 states that the allowance in all cases is to be made under regulations prescribed by the Secretary or his delegate.
 
 
 30
 The regulations under the 1939 Code provide in relevant part that if there is no representative market price for the taxpayer's crude mineral product, as here, 'then there shall be used in lieu thereof the representative market * * * price of the first marketable product resulting from any process or processes * * * minus the costs and proportionate profits attributable to * * * the processes beyond the ordinary treatment processes.' Treas.Reg. 118, 39.23(m)-1(e)(3).
 
 
 31
 The above provision was retained in the new regulations, with some explanatory material added. Proposed Treas. Reg. 1.613-3(d)(1)(i), 33 Fed.Reg. 10694 (1968). It is therein stated:
 
 
 32
 'The objective of the proportionate profits method of computation is to ascertain gross income from the property by applying the principle that each dollar of the total costs paid or incurred to produce, transport and sell the first marketable product or group of products earns the same percentage of profit. Accordingly, in the proportionate profits method no ranking of costs is permissible which results in excluding or minimizing the effect of any costs incurred to produce, sell and transport the first marketable product or group of products.'
 
 
 33
 Paragraphs (Iv) and (v) thereafter provide in relevant part:
 
 
 34
 '(iv) As used in this section, the term 'first marketable product or group of products' means the product (or group of essentially the same products) produced by the taxpayer as a result of the application of nonmining processes, in the form or condition in which such product or products are first marketed in significant quantities by the taxpayer. * * * For this purpose, bulk and packaged products are considered to be essentially the same product. The first marketable product or group of products does not include a product or group of products additionally refined, beneficiated, altered, or manufactured as a result of the application of additional nonmining processes. For example, if a cement manufacturer sells his own finished cement of various types in bulk and bags and also sells concrete blocks or dry ready-mix aggregates containing additives, the finished cement of various types, in bulk and bags, constitutes the first marketable product or group of products produced by him.' '(v) As used in this paragraph, the term 'gross sales (actual or constructive)' means the total of the taxpayer's actual sales to others of the first marketable product or group of products. * * *'[3]
 
 
 35
 With reference to the costs of bags and bagging, it is stated in Proposed Treas.Reg. 1.613-3(d)(4)(iii):
 
 
 36
 'In determining gross income from the property by use of the proportionate profits method. * * * (a) The costs attributable to containers, bags * * * and similar items as well as the costs of materials and labor attributable to bagging * * * or similar operations shall be considered as nonmining costs.'
 
 
 37
 Thus, the new regulations are clear that the costs of bags and bagging must be included in the proportionate profits formula, and that they must be allocated as nonmining costs. The earlier regulations also allow this result. Moreover, the case law (made prior to the promulgation of the new regulations) supports this conclusion. In United States v. Portland Cement Co., 378 F.2d 91, 92 (10th Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 478, 19 L.Ed.2d 468 (1967), for example, the court stated that the taxpayer's first marketable product was cement, and drew no distinction as to form of packaging. The court in Whitehall Cement Mfg. Co. v. United States, 369 F.2d 468, 469, 471 (3d Cir. 1966), also stated that the taxpayer's first marketable product was finished cement and specifically held that the packaging costs were 'properly allocable to the nonmining operations.' Id. at 474.
 
 
 38
 On the authority of the above regulations and cases, we hold that the costs of bags and bagging, and the profits attributable to sales of bagged cement, must be included in the computation of the taxpayer's depletion allowance, and that such costs are allocable to the nonmining part of taxpayer's operations.
 
 
 39
 Those cases cited by the taxpayer in support of a contrary result on this issue in our opinion are not controlling. In Standard Realization Co. v. United States, 289 F.2d 247 (7th Cir. 1961), Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9th Cir. 1961), and United Salt Corp. v. Commissioner, 40 does not stand for T.C. 359 (1963), aff'd per curiam, 339 F.2d 215 (5th Cir. 1964), the courts were not applying the proportionate profits method, as we are here, for there was a representative market price for the crude mineral product. Instead, the courts were concerned only with determining the cutoff point at which mining ceased and, faced with this question, they held that the taxpayers were not entitled to include the costs of bagging in their gross income, because bagging was not a cost of mining. If there were a representative market price for ground calcium carbonate, we would not resort to the proportionate profits method in the present case, and would then exclude all nonmining costs from the computation.
 
 
 40
 The taxpayer also cites standard Lime & Cement Co. v. United States, 329 F.2d 939, 165 Ct.Cl. 180 (1964). This case held that the costs incurred by the taxpayer in packing cement in bags were post-kiln-feed costs and, therefore, not attributable to mining. Id. at 948. We agree with this holding. However, Standard Lime also then held that these nonmining costs were 'indirect' costs and, for this reason, should be excluded from the depletion allowance formula. The only case cited by the court is Standard Lime in connection with its discussion of the costs of packing and containers, Morton Salt Co. v. United States, 316 F.2d 931, 161 Ct.Cl. 640, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), provides no authority for drawing such a distinction between costs, and does not involve the proportionate profits method. We conclude that there is no basis in the Code, the regulations, or case law for dividing nonmining costs into 'direct' and 'indirect' and excluding the latter from the proportionate profits formula, and we reject the distinction adopted in Standard Lime.
 
 
 41
 Finally, the taxpayer also relies upon the recent decision in United States v. Ideal Basic Indus., Inc., 404 F.2d 122 (10th Cir. 1968). That case regarded bulk cement as the first marketable product, and excluded the costs of bags and bagging from the formula, on the authority of Standard Lime and United Salt Corp. As previously discussed, United Salt Corp. does not stand for this proposition, and we are not persuaded by the reasoning in Standard Lime. Moreover, we do not find that the treatment of bag and bagging costs in Ideal Basic is consistent with other language of that opinion. Footnote 1 therein states that 'the sales price of the first marketable product is to be computed on the identical physical material that it represented by total mining and non-mining costs.' Id. at 125. However, it would appear from the opinion that the 'mining cost' is computed on all the cement produced, while the 'total cost of (bulk) cement' is only computed on the bulk cement. Thus, the numerator of the cost fraction includes costs for more cement than does the denominator. Moreover, as stated in the dissent in Ideal Basic, 'to eliminate all post-manufacturing costs destroys consideration of the representative market or field price of the first marketable product, a prime factor in the application of the equation, and thus seems * * * to reject the method itself.' Id. at 128.
 
 
 42
 For the foregoing reasons, we reverse the judgment of the district court with regard to the costs of bags and bagging.
 
 III. SELLING EXPENSES
 
 43
 The third question we must resolve is whether the taxpayer's selling expenses are to be included in the proportionate profits formula used to determine the depletion allowance and, if so, whether they are both mining and nonmining expenses, or only nonmining. The government's position is that these expenses should be included in the computation, and allocated to the nonmining category in their entirely. The taxpayer asserts the correctness of Finding of Fact No. 22 made by the district court (C.T. 185), which provided:
 
 
 44
 'During the taxable years ended April 30, 1953, April 30, 1954, April 30, 1955, April 30, 1956, April 30, 1957, April 30, 1958, and April 30, 1959, plaintiff incurred certain selling expenses with respect to the products of its cement and lime plants. These consisted primarily of salaries and other expenses of salesmen and membership in various industry trade associations. Said selling expenses did not represent the cost of any process applied to plaintiff's calcium carbonate rock and are to be excluded in the computation of plaintiff's percentage depletion allowances for said taxable years. In the alternative, if the computation prescribed in Treasury Regulation 118, Section 39.23(m)-1(e)(3) were to be made on the basis of inclusion of costs other than direct process costs, said selling expenses should be allocated proportionately to both the mineral product and the manufactured product because such expenses were necessary to and of benefit to both of such products.'
 
 
 45
 Section 39.23(m)-1(g) of Treasury Regulations 118 under the 1939 Code provides in pertinent part, with respect to the taxpayer's net income from the property for the purpose of the 50 per cent limitation on the depletion allowance (see 26 U.S.C. 613(a)), that 'deductions not directly attributable to particular properties or processes shall be fairly allocated.' The section also states that in cases where the taxpayer engages in activities in addition to mining, deductions for general expenses which cannot be directly attributed to any specific activity shall be fairly apportioned between mining and the additional activities 'taking into account the ratio which the operating expenses directly attributable to (mining) bear to the operating expenses directly attributable to the additional activities.'
 
 
 46
 With regard to selling expenses, the new regulations, Proposed Treas.Reg. 1.613-3(d)(1)(iii), 33 Fed.Reg. 10694 (1968), state:
 
 
 47
 'Those costs which are paid or incurred by the taxpayer to * * * sell * * * the first marketable product or group of products, and which are not directly identifiable with either a particular mining process or a particular nonmining process shall be properly apportioned to mining and to nonmining. In the absence of any specific provision of this section providing an apportionment method, such costs shall be apportioned by use of a method which is reasonable in the circumstances. One method which may be reasonable in a particular case is an allocation based on the proportion that the direct costs of mining processes and the direct costs of nonmining processes bear to each other.'
 
 
 48
 Section 1.613-4, paragraphs (a), (c)(4) and (6) thereafter provide in relevant part:
 
 
 49
 '(a) General rule. The term 'taxable income from the property (computed without allowance for depletion)', * * * means 'gross income from the property' * * * less all allowable deductions * * * which are attributable to extraction or mining processes, including * * * selling expenses. * * * Expenditures which may be attributable both to the mineral property upon which depletion is claimed and to other activities shall be properly apportioned to the mineral property and to such activities.' '(c) Treatment of particular items in computing taxable income from the property. In determining taxable income from the property under the provisions of paragraph (a) of this section-- (4) Selling expenses paid or incurred with respect to * * * a raw material product shall be subtracted from gross income from the property when determining the taxpayer's taxable income from the property. * * * In addition, a reasonable portion of the expenses of selling a * * * manufactured * * * product shall also be subtracted. * * * Such portion shall ordinarily be greater than zero, but not necessarily in proportion to other mining, extractive, nonmining, or postextractive costs. * * * In addition, a reasonable portion of the selling expenses incurred by a producer of a * * * manufactured * * * product such as * * * cement * * * shall also be subtracted from gross income from the property. (6) (A) reasonable portion of the trade association dues incurred by a producer of a * * * manufactured * * * product shall also be subtracted from gross income from the property. * * * The foregoing rule shall apply even though one of the principal purposes of an association is to advise, promote, or assist in the production, marketing, or sale of * * * manufactured * * * products. For example, a reasonable portion of the trade association dues paid to an association which promotes the sale of cement, * * * shall be subtracted from gross income from the property when determining taxable income from the property.'
 
 
 50
 From the foregoing regulations, it is clear that some selling expenses are normally allocable to mining operations, whether the taxpayer is in an integrated or nonintegrated industry. Furthermore, this is true even where the only product sold by the taxpayer has been manufactured by him.
 
 
 51
 The cases also support the conclusion that selling expenses should be apportioned between mining and nonmining in the proportionate profits formula. According to United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 87, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), and cases based thereon, e.g., Virginia Greenstone Co. v. United States, 308 F.2d 669, 673 (4th Cir. 1962); Standard Lime & Cement Co. v. United States, 329 F.2d 939, 946-947, 165 Ct.Cl. 180 (1964); United States v. Light Aggregates, Inc., 343 F.2d 429, 432 (8th Cir. 1965), and Solite Corp. v. United States, 375 F.2d 684, 687 (4th Cir. 1967), the miner-manufacturer is treated as selling to himself the crude mineral that he mines, and the depletion provisions are to be applied so as to provide equal tax treatment for integrated and nonintegrated miners. It is recognized that nonintegrated miners incur certain selling expenses when disposing of their product on the market;[4] similarly, it would follow that the integrated miner, who disposes of a composite of a mined and a manufactured product, and incurs selling expenses on the total product, should allocate these expenses between the mining and nonmining portions of his activities in computing the depletion allowance. Otherwise, the nonintegrated miner would receive a tax advantage not intended by Congress.
 
 
 52
 Thus, we hold that if an expense is incurred for the benefit of the entire operation, as the district court found the selling expenses were in the present case, it can properly be allocated between mining and manufacturing. See Standard Lime & Cement Co. v. United States, supra, 329 F.2d at 948. We further hold that the selling expenses in the instant case are to be allocated in the proportion that the mining costs bear to the total costs, in accordance with the finding and determination of the district court. This disposition finds further support in the decision in Whitehall Cement Mfg. Co. v. United States, 237 F.Supp. 838, 843-844 (E.D.Pa.1965), modified, 242 F.Supp. 327, 329 note 2, aff'd, 369 F.2d 468 (3d Cir. 1966). Hence, we affirm the district court's alternative disposition of selling expenses, as stated in Finding of Fact No. 22.
 
 
 53
 At the same time, we reject the treatment of selling expenses adopted in United States v. Ideal Basic Indus., Inc., supra, according to which selling expenses are entirely excluded from the computation. (This was also the treatment first specified by the court below in the present case.) To the extent that any items are excluded from the proportionate profits formula, a distortion results which affects the amount of depletion allowance. The taxpayer's selling price for its cement takes into account the fact that certain selling expenses are incurred, and to retain the actual selling price in the formula while excluding certain expenses which are necessary in order to obtain the selling price is untenable.
 
 IV. DISCOUNTS
 
 54
 The final question for us to decide is whether the discounts given by the taxpayer on the sales of its cement were trade or cash discounts. Section 613(a) of the 1954 Internal Revenue Code, as amended, states that the depletion allowance is to be based on the 'gross income from the property.' If it is determined that these were trade discounts, the amount of the discounts is deemed a reduction in sales price, and thus not includible in the taxpayer's total gross income. If, on the contrary, it is determined that these were cash discounts, the amount is treated as an expense to the taxpayer, and includible in gross income. Standard Lime & Cement Co. v. United States, supra, 329 F.2d at 947, note 18.
 
 
 55
 The government here contends that the discounts should be regarded as trade discounts, and that the taxpayer's gross income from the property should be based on the actual receipts rather than the list prices. The taxpayer maintains that these were cash discounts, and that the district court's findings and conclusions in this regard were correct. Finding of Fact No. 13 (C.T. 182) stated:
 
 
 56
 'Plaintiff offered to its customers, after sale, a discount of twently cents per barrel of cement and discounts with respect to paving dust and ground calcium carbonate rock. Said discounts were offered by plaintiff for the purpose of inducing prompt payment of plaintiff's invoices and not to induce sales of plaintiff's cement, paving dust, and ground calcium carbonate rock. As practiced and applied during the taxable years ended, April 30,1953, April 30, 1954, April 30, 1955, April 30, 1956, April 30, 1957, April 30, 1958, and April 30, 1959, such discounts were cash discounts and not trade discounts.'
 
 Conclusion of Law No. 6 (C.T. 189) stated:
 
 57
 'Plaintiff is not required to deduct from its 'gross income from mining' with respect to its Colton and Mojave mineral deposits any amount on account of the discounts allowed purchasers of its finished cement, paving dust (fines) and ground calcium carbonate rock.'
 
 
 58
 There is no specific provision in the regulations pursuant to the 1939 Code dealing with discounts. However, Proposed Treas.Reg. 1.613-3(e)(1)(i), 33 Fed.Reg. 10695 (1968), provides in relevant part:
 
 
 59
 'In the case of a taxpayer computing gross income from the property under the provisions of (the proportionate profits method), such (trade) discounts (if not otherwise taken into account) shall be subtracted from the gross sales (actual or constructive) of the first marketable product or group of products.'
 
 
 60
 No definitions of 'trade' and 'cash' discounts appear in the Code or regulations. But in Standard Lime & Cement Co. v. United States, supra, 329 F.2d at 947, note 18, it is stated that cash discounts are granted to purchasers in order to encourage prompt payment, thus producing a quicker flow of working capital, and that cash discounts differ from trade discounts in that the latter are granted at the option of the seller no matter when payment is made, depending on market conditions. The court then cited Rev.Rul. 60-257, 1960-2 CUM.BULL. 197 and Rev.Rul. 55-13, 1955-1 CUM.BULL. 285, wherein it is further stated that a cash discount is substantially equivalent to a charge in the nature of interest for use of the prepaid amount and represents a fair interest rate.
 
 
 61
 It was stipulated in the court below (Stipulation No. 11, C.T. 140) that during all the taxable years in question the taxpayer offered to its customers, after sale, a discount of twenty cents per barrel of cement and discounts with respect to paving dust and ground calcium carbonate rock. It was further stipulated (Stipulation No. 2, C.T. 165) that during all the years in issue all of the major cement producers in the Los Angeles, California area offered discounts to all of their customers as follows: A discount of twenty cents (20cents) per barrel for payment by the tenth (10th) of the month following the invoice date or the net amount after thirty (30) days.[5] The evidence showed that only a small percentage of the discounts were ever disallowed. See C.T. 102-112. For example, during the taxable year ended April 30, 1957, the taxpayer allowed discounts in excess of $1,000,000 on sales from its Colton and Mojave plants, while it disallowed discounts for only $347.
 
 
 62
 With regard to the amount of interest allowed by the discount, a sample invoice filed with the court (C.T. 101) shows that the quoted terms were: 'Net and due 30 days from date of issue-- Interest at 7% Per annum on overdue accounts. If payment is postmarked on or before the tenth of the following month, the amount of discount deductible is $ (20cents per barrel).' The price per barrel was $3.63; hence, the 20cents discount was equivalent to about 5 1/2%. This amount was allowed for prepayment of anywhere between 1 and 20 days, and when this amount is compared with the 7% Per annum rate for overdue accounts, we cannot conclude that the discount represented a fair interest rate. Rather, in light of the interest rate stated, plus the fact that the discount was so rarely disallowed, plus the fact that the same discount was so prevalent in the industry, we hold that the discount allowed by the taxpayer was a trade discount and therefore is to be treated as a reduction in sales price. Hence, we reverse the judgment of the district court expressed in Conclusion of Law No 6.
 
 
 63
 The judgment is affirmed in part and reversed in part, as indicated, and remanded for further proceedings not inconsistent with the views herein expressed.
 
 On Petition for Rehearing
 
 64
 The petition for rehearing is denied. We have considered the contentions and cases discussed therein, and reject them in favor of those in the court's opinion.
 
 
 65
 Petitioner Cement Company makes two contentions. First, the new regulations should not be applied retroactively. Second, the district court's finding of 'cash' discounts should be affirmed on appeal.
 
 
 66
 In support of the first contention, several cases are cited. Each is distinguishable. International Bus. Mach. Corp. v. United States, 343 F.2d 914, 170 Ct.Cl. 357 (1965), dealt with revenue relings, relating to individual taxpayers, and held that there should be equal treatment for competitors under the tax laws. Otherwise, Remington Rand and I.B.M. would have been given different tax treatment regarding their substantially identical machines, solely because of the fact that the I.R.S. responded promptly to Remington's request for a ruling, and slowly to the same request by I.B.M. The guiding principle in I.B.M. v. United States is stated at 920 therein: 'The Commissioner cannot tax one and not tax another without some rational basis for the difference.' California Portland has not shown that this principle has been violated in the present case.
 
 
 67
 In Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1938), the amendment in question contained no statement as to its retroactivity, and under these circumstances the Court held that there should not be retroactive application. The regulations in our case are explicitly retroactive.
 
 
 68
 Broadcasting Publications, Inc. v. District of Columbia, 114 U.S.App.D.C. 163, 313 F.2d 554 (1962), was also not a case of explicitly retroactive regulations to which the court refused retroactive effect. Rather, the new regulations were silent on retroactivity, and they further manifested a new approach, which led the court to reject retroactive application. In our case, on the other hand, the same result has been reached under both the new and the old regulations, and this result is also based on case law made prior to the promulgation of the new regulations. (See pages 168, 169.)
 
 
 69
 Commissioner of Internal Revenue v. Goodwyn Crockery Co., 315 F.2d 110 (6th Cir. 1963), cited by California Portland, is another case in which the regulations were silent as to retroactivity.
 
 
 70
 Thus, the cases cited and relied upon by the petitioner here are not authority for our refusing retroactive application to regulations which are explicitly retroactive, and which do not create the 'drastic inequality' and 'unjustifiable discrimination' referred to in I.B.M. v. United States.
 
 
 71
 On Page 4 of the petition for rehearing, it is stated that more than 8 cases have considered the treatment of bagging, but for some reason only one of these cases is discussed. In our opinion (see pages 168 and 169), we consider the various cases on this point, and conclude that they do not compel the result argued for by the petitioner.
 
 
 72
 On Page 7 of the petition, it is argued that the computation under the prior regulations must work back from the first marketable product. We have concluded that the first marketable product is cement, and that the district court's finding in this respect was one of law, and incorrect.
 
 
 73
 On Page 9 of the petition, it is stated that California Portland is being bound by a finding of fact in a case to which it was not a party. This is not true. Southwestern Portland Cement Co. v. United States, cited in footnote 5 is cited only to show that the terms offered by California Portland were the same as those offered by other producers.
 
 
 74
 On Page 10 of the petition, it is stated that prepayments were by at least 20 days. Even if this is the case, the discount is still not the equivalent of a charge in the nature of interest.
 
 
 75
 On Page 11 of the petition, it is stated that petitioner's discount is about 2 1/2 times that common in many other industries. This fact lends more weight to our conclusion that there was a trade discount.
 
 
 76
 On Page 12 of the petition, it is suggested that prevalence in the industry should not be material. We agree that this fact alone is not sufficient. This is why other reasons are both necessary and stated in the opinion (see pages 173, 174).
 
 
 77
 For the above reasons, we deny the petition for rehearing.
 
 
 
 [1]
 It is necessary to cite volume and page of the previous decisions because they bear the same title of court and cause
 
 
 [2]
 That equation was set out in our opinion in Riddell v. California Portland Cement Co., 330 F.2d 16, 17 (9th Cir. 1964), and it also appears in Proposed Treasury Regulation 1.613-3(d)(1)(ii). It is as follows: mining costs/total costs of products sold X gross sales = gross income from mining
 See also Whitehall Cement Mfg. Co. v. United States, 369 F.2d 468, 471 (3d Cir. 1966).
 
 
 [3]
 The phrase 'first marketable product or group of products' is not new to these regulations. It was used earlier in the Internal Revenue Code of 1939; section 114(b)(4)(B) therein referred to the ordinary treatment processes normally applied by mine owners or operators in order to obtain 'the commercial marketable mineral product or products.'
 
 
 [4]
 See Rev.Rul. 60-98, 1960-1 CUM.BULL. 252, quoted in United States v. Henderson Clay Prods., 324 F.2d 7, 13 (5th Cir. 1963), which stated that where a mine operator sells his product through a del credere sales agent, the full selling price, unreduced by the sales commission, should be included in the computation of 'gross income from the property' for percentage depletion. See also North Carolina Granite Corp. v. Commissioner, 43 T.C. 149, 159, note 13 (1964), wherein the court stated that 'reasonable selling expenses are normally considered as costs of mining'; and United Salt Corp. v. Commissioner, 40 T.C. 359, 370-373 (1963), aff'd per curiam, 339 F.2d 215 (5th Cir. 1964), wherein the court permitted the taxpayer to allocate selling expenses to both mining and nonmining activities
 
 
 [5]
 See Findings of Fact Nos. 22-25 in Southwestern Portland Cement Co. v. United States, 22 A.F.T.R.2d 5874, 5877 (C.D.Cal.1968), wherein the court found that on sales from its California plant the plaintiff offered the same discount to its customers as the present taxpayer; that the plaintiff followed industry practice in quoting these terms; that the discounted price was offered primarily to encourage purchases in competitive situations; that immediate payment was ininsisted upon only when the plaintiff was concerned about the customer's credit standing; and that in all other situations the price was invariably permitted to be paid after delivery. The court then concluded that the discount was a trade discount